NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-86

COMMONWEALTH

vs.

ALEXIS MIDDLETON.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

In 2008, following a jury trial in the Superior Court, the defendant, Alex Middleton, and his co-defendant, Donnell Nicholson, were each convicted of home invasion, aggravated rape, armed assault in a dwelling, four counts of kidnapping, two counts of indecent assault and battery, and four counts of assault and battery. The defendant's convictions were affirmed by a panel of this court in 2011. Commonwealth v. Middleton, 80 Mass. App. Ct. 1110 (2011). In 2022, a panel of this court affirmed the denial of the defendant's second motion for a new trial in part and remanded the matter solely on the issue of whether, under the applicable Massachusetts standard, the failure of the Commonwealth to provide certain personnel records of Massachusetts State Police crime laboratory employees warranted a new trial. Commonwealth v. Middleton, 101 Mass.

App. Ct. 1115 (2022).  On remand, the motion judge, utilizing the proper standard, denied the defendant's motion for a new trial.  In this appeal, the defendant contends that the motion judge erred in concluding that the Commonwealth's failure to provide exculpatory evidence would not have made a difference in the outcome of his trial.  We affirm.

Background.  We take the background facts from the judge's summary of the evidence admitted at trial which is largely consistent with the defendant's recitation of the facts, and where it is not, the judge's summary is supported by the record.  Around midnight on January 11, 2005, S. M. and three of his friends returned to S. M.'s home in Braintree to find two masked intruders inside looking for money and drugs.  Over the next hour, the intruders beat all four victims, ordered them to strip naked, and bound them.  The masked men continued to beat S. M. while demanding money and drugs, beat one victim in the head with a gun so severely he required stitches, threatened to kill all of the victims, forced one victim to take the defendant's penis into her mouth and perform oral sex, and threatened to rape a third victim.

During the assaults, the intruders heard someone pull into the driveway of the home and they fled to the basement.  One of the victims heard one of the intruders yelling, "Bitch, you need to come pick us up" and heard the two intruders communicating

2

with a Nextel two-way radio.  That victim remembered that at least once during the assaults, he heard a female's voice on the other end of the Nextel.  Although none of the victims were able to identify either of the attackers (because they were masked), the Commonwealth tied the defendant to the crimes using deoxyribonucleic acid (DNA) evidence, wiretap evidence, and the testimony of a cooperating witness (Tia) who was present when the defendant and codefendant planned and prepared for the robbery,[1] and was also present with the defendant and co-defendant after the assaults, when the co-defendant made incriminating statements.

After an investigation, the defendant was arrested in January of 2005 and later indicted.  On separate dates and at separate locations, the investigators gathered DNA samples of the rape victim and the two co-defendants; the DNA samples were then analyzed in the State Police Crime Laboratory (crime lab).  Carol Courtright, a criminologist working at the crime lab, detected sperm cells from the oral swab collected from the rape victim.  Massachusetts State Trooper Bruce Tobin separately obtained buccal swabs of each of the co-defendants in the

---

[1] The witness testified that the day before the attack, she went for a drive with both defendants.  During the trip, co-defendant Nicholson procured a shotgun and a bulletproof vest, and drove a few times by the home where the victims were attacked while talking about robbing the owner of money and marijuana.

presence of their attorneys. Tobin individually labeled each buccal swab and affixed the name of the defendant from whom he took the sample, before he sealed and stored the swab at the crime lab. In late 2005, at the crime lab, Hillary Griffiths took the three known samples and developed a DNA profile for each sample. Another DNA analyst, Rachel Chow, analyzed the sperm that was preserved from the oral swab of the rape victim. Chow determined that the male DNA profile from the oral swab of the victim matched the DNA profile from the defendant's buccal swab.

In anticipation of the Commonwealth's introduction of the DNA evidence, defense counsel made pretrial discovery requests for "background information" about each person involved in conducting or reviewing DNA testing in this case. Before trial, the Commonwealth produced information about Hilary Griffiths and Rachel Chow including proficiency test results and resumes. At trial, the Commonwealth did not call Chow or Griffiths to testify about the DNA, but rather the DNA evidence was presented through a supervisor of the DNA unit, Caitlin Drugan. Drugan did not perform the analysis but independently evaluated Chow's and Griffiths's work, confirmed their analyses, and offered her own opinion that the defendant was a statistical match for the DNA found in the rape victim's mouth.

4

More than a decade after the defendant was convicted, the defendant's ongoing discovery efforts revealed additional, previously undisclosed personnel file information about Griffiths's and Chow's employment at the crime lab. This additional information included documents dated in 2006, by which Griffiths and Chow were separately notified that they were suspended from certain analytical duties. The suspensions referenced "instances of DNA . . . discrepancies" in the few months preceding the suspensions, and issues with their "skill set to focus on tasks without sample mix-ups, as aliquots are not placed in appropriate tubes/rows." As we noted in our August 12, 2022 decision, "the personnel files also contained information prepared after the date of trial but that related to Griffiths's work performance at and around the time of her work on the samples in this case -- a 2009 State Police report including indirect reports that Griffiths 'was not capable of performing daily exemplar work until shortly before June 3, 2008,' and indications from Griffiths in an undated transcript excerpt and an e-mail exchange with a supervisor in 2013 suggesting that lab personnel were hiding mistakes made during testing." Middleton, 101 Mass. App. Ct. at 1115.

The defendant moved for a new trial based upon the Commonwealth's failure to produce exculpatory evidence. Id. Initially, the defendant argued that Chow may have mixed up the

5

DNA profiles and mistakenly identified the defendant, instead of Nicholson, as the individual whose DNA matched the sperm DNA found in the victim's mouth.  Upon learning that Chow did not handle or analyze the exemplars of either Middleton or Nicholson, the defendant changed his argument, instead claiming that Griffiths may have mixed up the samples and mistakenly generated a DNA profile from Nicholson's sample and assigned it to Middleton.  The defendant contends that, despite the fact that the DNA samples of each of the co-defendants were separately collected and labeled by Trooper Tobin before being stored at the crime lab, Griffiths switched the exemplars of Middletown and Nicholson.  The defendant claims that, had the evidence of the personnel files been timely provided to him, he could have impeached Drugan's opinion testimony and it would have had an impact on the outcome of the trial.

Discussion.  1.  Standard of review.  "Under Mass. R. Crim. P. 30 (b), [as appearing in 435 Mass. 1501 (2001)], a judge may grant a motion for a new trial at any time if it appears that justice may not have been done."  Commonwealth v. Williams, 89 Mass. App. Ct. 383, 387 (2016), quoting Commonwealth v. Scott, 467 Mass. 336, 344 (2014).  "We review a judge's decision to deny a motion for a new trial without holding an evidentiary hearing 'for a significant error of law or other abuse of discretion.'"  Commonwealth v. Upton, 484 Mass. 155, 162 (2020),

quoting Commonwealth v. Bonnett, 482 Mass. 838, 843-844 (2019). In our review for abuse of discretion "must give great deference to the judge's exercise of discretion; it is plainly not an abuse of discretion simply because the reviewing judge would have reached a different result." L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). In other words, an abuse of discretion occurs if a judge makes "'a clear error of judgment in weighing' the factors relevant to the decision'" (citation omitted). Id. "[W]e 'extend[ ] special deference to the action of a motion judge who was also the trial judge.'" Commonwealth v. Conley 103 Mass. App. Ct. 496, 512 (2023), quoting Commonwealth v. Grace, 397 Mass. 303, 307 (1986).

2. Exculpatory evidence. In order to obtain a new trial on the basis of nondisclosed exculpatory evidence, "a defendant must establish (1) that the evidence [was] in the possession, custody, or control of the prosecutor or a person subject to the prosecutor's control; (2) that the evidence is exculpatory; and (3) prejudice." Commonwealth v. Caldwell, 487 Mass. 370, 375 (2021).

As to the third element -- prejudice -- the motion judge analyzed the defendant's request for "background information" of the crime lab employees as a "specific request." When a motion for a new trial is based upon a specific request for exculpatory evidence, "a defendant need demonstrate only that a substantial

7

basis exists for claiming prejudice from the nondisclosure."

Commonwealth v. Pope, 489 Mass. 790, 801 (2022), quoting

Commonwealth v. Tucceri, 472 Mass. 401, 412 (1992).[2]  See

Commonwealth v. Healy, 438 Mass. 672, 680 (2003), quoting

Commonwealth v. Daye, 411 Mass. 719, 729 (1992) ("In cases

involving a specific request for evidence, we look to the record

to determine 'whether we can be confident that even if the

prosecution had supplied the report to the defendant[] in a

timely fashion, the report or available evidence disclosed would

not have influenced the jury'").  The defendant bears the burden

of establishing that he was prejudiced by the failure to

disclose the evidence.  See Commonwealth v. Imbert, 479 Mass.

575, 583 (2018).

In her analysis, the judge applied the most favorable

standard of review for the defendant, but nevertheless denied

his second motion for a new trial.  On this record, we perceive

no abuse of discretion.  The judge properly considered whether

the evidence, had it been disclosed, "would have influenced" the

jury, Daye, 411 Mass. at 729, and concluded that the defendant

failed to show that there was a "reasonable possibility that the

---

[2] If the request for evidence is non-specific, the test is
"whether there is a substantial chance that the jury might not
have reached verdicts of guilt if the undisclosed evidence had
been introduced in evidence."  Tucceri, 412 Mass. at 413.

8

nondisclosed evidence would have made a difference."  Imbert,

supra.

The judge carefully considered the nondisclosed evidence in the context of the strength of the entire case against the defendant.  Commonwealth v. Lykus, 451 Mass. 310, 329-330 (2008).  The judge described how the DNA evidence was just a part of the Commonwealth's case against the defendant.  In particular, Tia, a witness for the Commonwealth, testified at trial that she and the defendant had been friends for a couple of years, and that the day before the home invasion she went on a drive with the defendant and Nicholson.  Tia's testimony placed the defendant in the car when they drove by S. M.'s home in Braintree and Nicholson spoke about robbing S. M. of money and marijuana.  On the drive Nicholson, who already had a handgun in the car, retrieved a shotgun and a bulletproof vest.  During the intrusion, Nicholson called Tia on the Nextel radio.  Later, Tia asked Nicholson what happened with the female victim at the house and Nicholson laughed and told her "it wasn't him."  Tia's testimony also placed the defendant in the car with Nicholson and Tia the day after the home invasion, at which time Nicholson threatened to kill Tia's mother, daughter, and Tia, herself, if Tia spoke to the police.

Furthermore, as the judge explained, it was Caitlyn Drugan, not Griffiths or Chow, who testified at trial that the DNA of

9

the defendant matched the DNA of the sperm taken from the victim's mouth.[3]  The judge concluded that "at no time up to and including the present (and despite having filed two motions for a new trial and a revised motion) has the defendant actually identified any errors in the DNA analysis . . . or offered any scientific basis for challenging its accuracy."  Moreover, the judge noted that, with the evidence provided, the defense was able to argue strenuously at trial that the jury should disbelieve that Chow or Griffiths "performed in a manner that was appropriate" and that "there's no indication that the oral swab that was presented to the DNA lab was that of Mr. Middleton[]."  Although the additional personnel files no doubt could have been used for additional impeachment, nothing in these documents indicated that the concerns with the work of Chow or Griffiths had to do with their work on the defendant's sample, and more importantly, it remains that Drugan independently reviewed the DNA testing and provided an opinion that was subject to thorough cross-examination.

Simply put, the defendant's claim that Griffiths may have swapped the DNA samples of the defendant and Nicholson remains

---

[3] Drugan's opinion testimony at trial relating to the DNA evidence was upheld in an earlier ruling of this court because she independently reviewed the DNA evidence.  See Commonwealth v. Middleton, 80 Mass. App. Ct. 1110.  The defendant's claim that Drugan did not independently analyze the evidence is without support in the record.

10

entirely speculative, with no grounding in the personnel files or in the other evidence presented or available.  Recognizing the special deference we owe to the motion judge, who was the trial judge and had a superior insight into how the jury reacted to Drugan's testimony and the defense's attacks upon it, we discern no error in her determination that there was not enough to establish a substantial basis for a claim of prejudice.

<u>Order entered January 4, 2023, denying second motion for new trial affirmed</u>.

By the Court (Ditkoff, Englander & Walsh, JJ.[4]),

Assistant Clerk

Entered:  January 19, 2024.

---

[4] The panelists are listed in order of seniority.

11