COMMONWEALTH *vs.* JUSTIN HOLMES.

No. 97-P-1395.

Middlesex. September 15, 1998. - March 30, 1999.

Present: ARMSTRONG, DREBEN, & JACOBS, JJ.

*Practice, Criminal,* Agreement between prosecutor and witness, Argument by prosecutor, New trial, Instructions to jury. *Homicide.*

In a criminal case, evidence of a witness's agreement with the prosecution to cooperate and testify truthfully could not reasonably be read as impermissible vouching by the Commonwealth for the witness's credibility [554-555], and the prosecutor's reference to the agreement in closing argument was not improper [555]; further, the judge's failure to give a cautionary instruction regarding the jury's consideration of the witness's credibility was not, standing alone, reversible error [555-556].

In a criminal case, the record of proceedings on the defendant's motion for a new trial did not demonstrate that a certain witness had an undisclosed cooperation agreement with the prosecutor [558-559], and, in any event, had the witness's testimony incorporated his statements in his affidavit submitted in support of the motion for a new trial, it would have had but slight effect, if any, upon the jury [559-561].

An affidavit submitted in support of a criminal defendant's motion for a new trial did not raise any issue of newly discovered evidence or raise any substantial issue requiring a hearing. [561-563]

At the trial of a murder indictment, there was no evidence to require an instruction to the jury on manslaughter. [563]

INDICTMENT found and returned in the Superior Court Department on June 22, 1989.

Following review by this court, 32 Mass. App. Ct. 906 (1992), a motion for a new trial, filed on April 22, 1997, was considered by *Hiller B. Zobel,* J.

*Murray A. Kohn* for the defendant.

*Marguerite T. Grant,* Assistant District Attorney (*Edward D. Rapacki* with her) for the Commonwealth.

DREBEN, J. Following a June, 1989, melee between Cambridge and Belmont youths that led to the death of Andreas Dresp of

Belmont, the defendant was convicted of second degree murder. His conviction was upheld on appeal, 32 Mass. App. Ct. 906 (1992). Critical to the Commonwealth's case was the testimony of three witnesses, Austin Price, Toryn Chambers, and Andrew Calkins. In a motion for a new trial filed in 1997, the defendant challenged the evidence elicited from the three: Price's on the ground that the judge and prosecutor mishandled a cooperation agreement in violation of the teaching of *Commonwealth* v. *Ciampa*, 406 Mass. 257 (1989); Chambers's on the basis that the prosecution failed to disclose a cooperation agreement between the Commonwealth and Chambers; and Calkins's for the reason that the prosecutor not only failed to disclose that Calkins had recanted, but also threatened Calkins with perjury charges if he corrected his testimony. The defendant's motion also claimed error in the failure of the judge to give sua sponte a jury instruction on voluntary manslaughter on the theory of sudden combat. We affirm the denial of the motion for a new trial.[1]

1. *Price's cooperation agreement.* Price testified that after the fracas, the defendant told him he had stabbed someone; that when he heard the youth had died, the defendant stated he was going to look for a knife he had dropped; and that subsequently the defendant asked Price to keep the matter quiet. On cross-examination, counsel for the defendant elicited testimony that before Price testified to the grand jury, he had entered into an agreement with the Commonwealth that he would not be prosecuted for any of the crimes arising out of Dresp's death. Price admitted that shortly after the incident, when the police executed a search warrant at Price's house, they found blood on Price's hand and in his bathtub. At that time, he had not told the police of the defendant's admissions nor of his own admission that he had stabbed someone.

On cross-examination of Price, defense counsel asked several questions concerning Price's agreement:

*Q*: "And your deal, sir, that deal was to testify truthfully, right?"

*A*: "Yes."

---

[1] The motion judge, who was also the trial judge, denied the motion with the following endorsement: "All the points this motion seeks to raise could have been raised upon the appeal, *Comm.* v. *Holmes*, 32 Mass. App. Ct. 906 (1992) (rescript); indeed, the Appeals Court expressly disposed of the manslaughter issue, *id.* at 908. I decline to act on this motion."

*Q*: "And it's fair to say that it's your understanding that the person who determines whether it's truthful, is the person you entered the deal with, right?"

*A*: "Yes."

*Q*: "And that's [the prosecutor]?"

*A*: "Yes."

*Q*: "So if he's happy with your testimony, you're not going to get prosecuted, right?"

*A*: "Correct."

*Q*: "And you haven't been prosecuted, have you?"

*A*: "No, I haven't."

*Q*: "No complaints or indictments have been issued against you?"

*A*: "None."

On redirect examination, the prosecutor offered the agreement in evidence, and it was admitted over the defendant's objection that it was cumulative and self-serving. The agreement was a letter dated June 21, 1989, addressed to Price from the prosecutor and assented to by Price. It provided as follows:

> "This letter will confirm our agreement regarding the investigation into the stabbing death of Andreas Dresp, who died on June 11, 1989.

> "You have represented to me that you did not participate in any way in said stabbing, but that you have information regarding the crime. You have agreed to testify truthfully before the grand jury, at any pre-trial proceeding, and at any trial that may result. In return, the Commonwealth hereby agrees that you will not be prosecuted for your actions on Saturday, and Sunday, June 10 and 11, 1989.

> "This agreement shall be considered to have been breached by you in the event that you fail to testify truthfully at any such grand jury or pre-trial proceeding or trial,

or if the Commonwealth establishes that you participated in the stabbing of Andreas Dresp."

Relying on *Commonwealth* v. *Ciampa, supra,* the defendant claims a new trial is required because (1) the language of the Price agreement constituted impermissible vouching by the Commonwealth for the witness's reliability; (2) the prosecutor improperly used the agreement in closing argument; and (3) the judge failed to give proper cautionary instructions concerning Price's reliability.

The standard for reviewing the manner in which the cooperation agreement was handled at trial, which was not raised on the defendant's direct appeal, is whether the errors, if any, created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Curtis,* 417 Mass. 619, 624-625 n.4, 626 (1994). See *Commonwealth* v. *Hallet,* 427 Mass. 552, 553 (1998). There is no such risk here.

We note first that *Ciampa* was decided after the defendant's trial had concluded, and it appears, as the Commonwealth suggests, that the case applies only to future trials.[2] See *Commonwealth* v. *Martinez,* 425 Mass. 382, 398 (1997). But cf. *Commonwealth* v. *Daye,* 411 Mass. 719, 739-740 (1992) (*Ciampa* analysis applied to pre-*Ciampa* trial). In any event, the cooperation agreement and its use by the prosecutor were consistent with the principles of our cases and, in the circumstances, a cautionary instruction by the judge was not necessary.

In *Ciampa, supra,* the court accepted the rule that, if appropriately handled, "testimony pursuant to a plea agreement, founded on a promise of truthful cooperation, and the plea agreement itself are admissible," *id.* at 261, and do "not constitute improper prosecutorial vouching for a witness." *Id.* at 260. There are certain requirements for such admissibility, and since some of the provisions of the agreement in that case were too prejudicial, the court held they should have been redacted. A majority of the court considered that a "statement that the agreement was 'contingent upon the truthfulness of [the

---

[2]We also note that *Ciampa* was a first degree murder case, where the court was applying the standard of G. L. c. 278, § 33E, *Ciampa, supra* at 268-269, rather than the standard of *Commonwealth* v. *Freeman,* 352 Mass. 556 (1967). The *Freeman* standard "appears to be a harder one for a defendant to satisfy." *Commonwealth* v. *Lennon,* 399 Mass 443, 448-449 n.6 (1987). Moreover, many of the objections in *Ciampa* were preserved for appeal (and thus received a more generous standard of review).

witness's] representation to the Commonwealth that he, personally, did not shoot the victim,' " could be read as an implicit assertion by the Commonwealth that the witness's representation was true. *Id.* at 262.[3] Accordingly, it "should have been redacted on request by a defendant."[4] *Ibid.*

The defendant argues that, since the Price cooperation agreement, like the agreement of the witness in *Ciampa*, was contingent on the truth of Price's statements as to his own lack of involvement in the death of the victim, the Commonwealth, in effect, improperly vouched for or attested to the truth of Price's representation. The language of the Price letter, however, makes clear that it is Price who made the representation. In return for Price's agreement to testify truthfully, the Commonwealth agreed that he would not be prosecuted.

That the difference in language is important and that implicit vouching by the Commonwealth will not be readily found, is indicated by the agreement upheld in *Commonwealth* v. *Gordon*, 422 Mass. 816, 833-834 (1996). The last sentence of that agreement provided:

> "This promise is expressly conditioned on your representation that you did not participate in either stabbing mentioned above and on your complete and truthful cooperation with the Commonwealth."

*Id.* at 834. The complete agreement considered in *Gordon* is set out in the margin.[5] In rejecting the defendants' claim that the agreement of the witness required him "to comport with a

---

[3] Three judges dissented and considered that "[t]he statement says no more than [what the dissent suggests the majority would also view as proper, namely] that, if [the witness's] representation indeed should turn out to have been false, the Commonwealth will have no obligation with respect to a sentencing recommendation." *Ciampa, supra* at 274 (O'Connor, J., dissenting).

[4] In the present case there was no such request.

[5] The agreement provided:

> "You have stated to [an] Assistant District Attorney that you were present at, and have direct knowledge of, the robbery and stabbing of Jesse McKie and the stabbing of Rigoberto Carrion, both events occurring in Cambridge on January 25, 1990. You have represented to [the assistant district attorney] that you did not participate in the robbery and/or stabbing of Mr. McKie or in the stabbing of Mr. Carrion.

> "In return for your complete and truthful cooperation, including

particular factual scenario" envisioned by the Commonwealth, the *Gordon* court, at 834, explained,

> "The agreement does not say that the Commonwealth's performance is contingent on [the witness's] testimony conforming to the Commonwealth's version of the events. Rather, the Commonwealth's commitment is conditioned on [the witness's] noninvolvement in the two killings and his 'truthful cooperation' with the Commonwealth."[6]

Price's agreement is not verbally "contingent" on his representation (contrast *Ciampa, supra* at 262), is similar to the language discussed in note 3, *supra*, and can not, reasonably, be read as impermissible vouching by the Commonwealth.

Although the defendant claims that the prosecutor in his closing improperly used the agreement to imply that the Commonwealth had verified that Price was telling the truth, the defendant's argument has no merit. "A prosecutor in closing argument may restate the government's agreement with the witness and may argue reasonable inferences from the plea agreement's requirement of truthful testimony." *Id.* at 265. What he or she may not do is to suggest that the government has special knowledge by which it can verify the witness's testimony. This the prosecutor did not do. He asked the jury to read closely the letter to Price and "[p]ay very close attention to the last paragraph," a paragraph which the prosecutor then read aloud. This was the only reference to the agreement and was not improper.

There was also no reversible error in the judge's failure to

---

testimony at any and all grand jury, pretrial and/or trial proceedings, the Commonwealth of Massachusetts, District Attorney for Middlesex County, hereby represents that no criminal proceedings will be initiated or prosecuted against you for your activities on the night of January 24-25, 1990. This promise is expressly conditioned on your representation that you did not participate in either stabbing mentioned above and on your complete and truthful cooperation with the Commonwealth."

*Commonwealth* v. *Gordon*, 422 Mass. at 833-834.

[6]The challenge in *Gordon* was that the requirement that the witness "truthfully cooperate" created too great an inducement to lie. That the court also cited *Commonwealth* v. *Ciampa* in the same paragraph, 422 Mass. at 834, as the language of the opinion quoted in the text above, strongly suggests that implicit vouching by the Commonwealth was not found in the promise conditioned on the witness's representation.

give a cautionary instruction to consider the witness's credibility with particular care. It is true that "[w]hen a prosecution witness testifies pursuant to a plea agreement containing a promise to tell the truth, and the jury are aware of the promise, the judge should warn the jury that the government does not know whether the witness is telling the truth." *Commonwealth* v. *Meuse,* 423 Mass 831, 832 (1996). The failure to instruct, standing alone, is, however, not reversible error. *Ibid.*

Contrary to the defendant's contention, "[t]his case does not present the question presented in *Ciampa,* that is, whether the jury instructions *cured the errors* in failing to redact [prejudicial admission of certain portions of a written plea agreement and] the repeated references to the witness's obligation to tell the truth. . . . [T]herefore, . . . the defendant[] [was] not entitled to a specific instruction that the jury should exercise special caution in evaluating [the witness's] testimony." (Emphasis supplied). *Commonwealth* v. *Daye,* 411 Mass. at 740. This is especially true here where defense counsel's vigorous cross-examination of Price laid stress on his motives for pleasing the prosecutor. See *ibid.* See also *Commonwealth* v. *Brousseau,* 421 Mass. 647, 654 (1996).

In sum, there was no error, let alone a substantial risk of a miscarriage of justice, in the handling of the Price cooperation agreement at trial.[7]

2. *Alleged agreement of cooperation between Chambers and the prosecutor.* In his June 22, 1989, appearance before the grand jury, Chambers did not implicate the defendant in Dresp's death. He testified that the defendant never admitted the stabbing, but to the contrary, denied having done so. At trial, Chambers told a different story, devastating to the defendant, which included the defendant's admission to the stabbing.

In support of his motion for a new trial — on the basis of newly discovered evidence — the defendant proffered an affidavit of Chambers dated January 28, 1997. Chambers there alleged:[8]

> "6. In June, 1989, I was arrested and charged with intimidation of a witness.

---

[7]Although it would have been "the better course," see *Ciampa* at 263 n.6, to delete the signature of the prosecutor, the failure to do so did not create a substantial risk of a miscarriage of justice.

[8]The affidavit does not contain any paragraphs bearing numbers 1-5.

"7. After being arrested, I was held on $2,500 cash bail, which I was unable to post.

"8. A few days after being arrested and held on bail, I gave a statement to the police in the case involving Justin Holmes.

"9. After giving the statement, I was told that if I testified for the government in the case against Justin Holmes, things would work out for me on the charge of intimidation of a witness pending against me, and I agreed to testify for the government.

"10. A few days later, I was brought into Court and the government recommended that my bail be lowered to $1,000 cash, an amount which my family was able to pay."

Other documents and transcripts filed in support of the defendant's motion indicate that the intimidation charge, as well as an assault and battery charge against Chambers, arose out of an incident on June 28, 1989, in which Chambers confronted Price, told him he did not have to testify, and punched him.[9] At Chambers's arraignment on those charges on June 30, 1989, he was ordered held on $2,500 cash bail, which he was unable to post. On July 3, 1989, with counsel present, Chambers related a version of events to police substantially consistent with his later trial testimony. On the same day, Chambers petitioned the Superior Court for reduction of bail; bail was reduced to $1,000, the amount recommended by the prosecutor (the same prosecutor who prosecuted the defendant's case).

On October 18, 1989, after the completion of the defendant's trial, Chambers and a codefendant pleaded guilty before the same judge who had presided at the trial in the defendant's case. When the judge, troubled by the leniency of the suggested sentence, asked why the prosecutor was recommending a less severe sentence — a suspended sentence — for Chambers, who was more culpable than his codefendant, the prosecutor gave the explanation set forth in the margin.[10] He added that, had

---

[9]Others were involved in the incident and a codefendant was charged with the same offenses.

[10]"Mr. Chambers was an eyewitness to a homicide, a murder which underlied [sic] this entire series of incidents. Mr. Chambers, without the agreement with counsel as to an ultimate disposition, waived what I considered to be

Chambers not been in possession of critical evidence in the murder case, he would have sought a much higher sentence.

Based on Chambers's affidavit and the favorable treatment received by him from the prosecution, the defendant claims that there was an undisclosed cooperation agreement between Chambers and the prosecution requiring a new trial. See *Commonwealth* v. *Gilday*, 382 Mass. 166, 178 (1980); *Commonwealth* v. *Collins*, 386 Mass. 1, 9 (1982); *Commonwealth* v. *Tucceri*, 412 Mass. 401, 404-406 (1992). Since the defendant had specifically moved for evidence of promises and inducements, a failure to produce such materials would require a new trial unless the "error did not influence the jury, or had but very slight effect." *Commonwealth* v. *Gilday, supra,* quoting from *United States* v. *Agurs*, 427 U.S. 97, 112 (1976), quoting from *Kotteakos* v. *United States*, 328 U.S. 750, 764 (1946).

The determination whether a new trial is required based on an affidavit that a key prosecution witness may have lied or may have received undisclosed promises is left to the sound discretion of the trial judge. See *Commonwealth* v. *Stewart*, 383 Mass. 253, 257, 259 (1981); *Commonwealth* v. *Raymond*, 424 Mass. 382, 397 (1997). In making that determination, the judge must consider "not only . . . the seriousness of the issue asserted, but also . . . the adequacy of the defendant's showing on the issue raised." *Commonwealth* v. *Stewart, supra* at 257-258.

In the case at bar, the judge who denied the defendant's motion had considerable acquaintance with Chambers. He had been the trial judge and thus had heard Chambers's testimony, and he had also been the judge who had taken Chambers's plea, and had sentenced him in the intimidation case. While it would

valid Fifth Amendment rights with respect to this case, and valid Fifth Amendment rights with respect to the murder, and testified as the Commonwealth argues truthfully and completely at the trial of the underlying murder . . . . But for that truthful testimony, and the fact that that truthful testimony was essential in order to obtain justice in the death of Andreas Dresp, and only for that reason, the Commonwealth thinks that, firmly believes that a penalty of incarceration now would result in a feeling on the street, and a recognition on the street, that if you cooperate with authorities, not only is it not going to help you, but it might very well end up hurting you. And in the interest of being able to ensure that law enforcement authorities are able to get the information they need to solve what is really the underlying crime, the serious crimes that we're talking about, that a recognition that there is a benefit to society and people on the street for telling the truth, for cooperating with the authorities, is essential."

have been preferable for the judge to specify that the affidavit did not raise a substantial question warranting a hearing, rather than rule as he did, see note 1, *supra,* in view of the record on appeal, we deem it unnecessary to remand for an explicit ruling for what was undoubtedly implicit in the judge's denial of a new trial.

Chambers's assertion in his affidavit that an unidentified person had told him that things "would work out for him" if he testified for the government and he agreed to so testify does not establish the existence of a cooperation agreement. "[T]he fact that [he] expected to, and did, receive favorable treatment after the defendant's trial does not amount to a deal." *Commonwealth v. Doherty,* 394 Mass. 341, 348 n.9 (1985). In addition, Chambers's presentencing memorandum in the intimidation matter[11] unequivocally stated: "It should be noted that at no time did [the prosecutor] promise or even offer any lenience to Toryn."[12]

Thus the affidavit, even when coupled with the favorable treatment received by Chambers, does not carry a measure of strength in support of the defendant's position that there was an agreement between Chambers and the prosecutor. Moreover, in view of the extensive and effective cross-examination of Chambers by the defendant's counsel, we are confident that even had Chambers testified in accordance with his affidavit, such additional testimony would not have "influence[d] the jury, or [would have] had but very slight effect." See *Commonwealth v. Gilday,* 382 Mass. at 178.

As in the case of Price, defense counsel vigorously cross-examined Chambers and laid stress upon his previous inconsistent stories to the police and the grand jury. He elicited evidence of Chambers's pending indictments for intimidation of a wit-

---

[11]The memorandum is contained in the Commonwealth's supplementary appendix. The Commonwealth asserts in its brief that it did not present the memorandum to the motion judge because the judge denied the defendant's motion on the day after it was filed and before the Commonwealth had had an opportunity to supplement the record. The Commonwealth argues that this court may take judicial notice of the memorandum as pleadings in an ancillary case. We do not rest on that ground, but note that the defendant in his reply brief makes reference to the memorandum and does not argue that it may not be considered. Cf. *Commonwealth v. Stewart,* 383 Mass. at 257 n.8.

[12]Counsel added, "However, it was my feeling that [the prosecutor] was an honorable man who would take Toryn's cooperation into consideration in his sentencing recommendation."

ness and assault and battery. He highlighted the fact that Chambers went to jail, and that bail was reduced at about the same time that he changed his story. Chambers acknowledged that he did not want to be incarcerated, and that the assistant district attorney who was prosecuting the defendant was also in charge of his, Chambers's, case. Chambers admitted that he would "much rather have a happy" prosecutor than an "angry" one. Counsel asked:

> *Q*: "Because if you can convince [the trial prosecutor] that you're telling the truth, he's going to recommend no time, isn't he?"
>
> *A*: "I don't know."
>
> *Q*: "You sure hope he does, right?"
>
> *A*: "That's right."

Counsel elicited that Chambers was informed by his attorney that perjury in a murder case was punishable by life imprisonment and that the prosecutor had the power to seek a perjury indictment. When Chambers was asked if he had been indicted for perjury, he answered, "No, I haven't, not yet."[13]

In closing summation, defense counsel urged the jury to reject

---

[13]Chambers on cross-examination was also asked:

> *Q*: "And you believe, don't you, sir, and you have an understanding, that if the Assistant District Attorney is satisfied with your testimony, you won't be indicted?"
>
> *A*: "I don't know that."
>
> *Q*: "Certainly your lawyer's led you to believe that, right?"
>
> *A*: "No, they haven't."
>
> *Q*: "He's never said, 'If [the assistant district attorney] is happy with your testimony and he thinks you told the truth, you may not get indicted?' "
>
> *A*: "He said — "
>
> *Q*: "He never said that?"
>
> *A*: "No, he, yeah he said something like that — "
>
> *Q*: "He sure did."
>
> *A*: " — to that effect."

Chambers's testimony as not credible. He laid stress on the fact that Chambers changed his story immediately after obtaining his freedom after having spent time in jail.

In view of the evidence brought out on Chambers's cross-examination, we are confident that, had Chambers's testimony incorporated the statements of his affidavit, it would have had but slight effect, if any at all, upon the jury.

3. *Calkins's affidavit.* At trial, Calkins testified that after the altercation between the Cambridge and Belmont youths, he, the defendant, and others were sitting on the couch in Price's living room. While Calkins was talking to the person on his right, the defendant who was sitting to his left,

> "like tapped me, so when I turned to him, and it wasn't exactly clear, so I couldn't really quote it, but it's 'Got him, got him there, got,' something like that, 'got him here.' I couldn't like really elaborate. I, maybe, 'Hit him here, got him here,' something like that."

Calkins, by pointing to his body, indicated that when the defendant made the foregoing statement, the defendant's hand was on Calkins's right side along his rib cage. (The medical testimony as to the location of the victim's stab wound was consistent with where the defendant had touched Calkins's body.)

As he argues with respect to Chambers's evidence, the defendant claims that there is newly discovered evidence with reference to Calkins's testimony which requires a new trial. He contends that Calkins, after testifying to the grand jury, recanted, that the prosecutor became angry, and by threatening Calkins with perjury, precluded him from giving testimony favorable to the defendant. Calkins's affidavit is dated September 23, 1994, and was submitted two and one-half years later by the defendant with his motion for a new trial. Calkins's affidavit is set forth in the margin.[14] An examination of the affidavit does not support the defendant's claims. There was no recantation by Calkins of

---

[14]"I, Andrew Calkins, hereby declare and say as follows:

> "1. On the night of June 10/11, 1989, I was at Austin Price's house, at 25 Corcoran Park, Cambridge, Massachusetts following an altercation which had occurred earlier that evening.

either his grand jury testimony or his trial testimony. He did not claim that he lied or even that he testified inaccurately. Indeed, a comparison of his grand jury testimony with his testimony at trial is consistent with his affidavit, and shows that he was less certain at trial and that his grand jury testimony was more inculpatory.[15] Assuming that the prosecutor showed excessive

"2. I was sitting on a couch with Justin Holmes, who was seated to my left.

"3. At one point during the evening, Justin Holmes tapped me on my left side, to get my attention, and said something which I did not fully understand at the time.

"4. Approximately one week later, after I heard that Justin Holmes was arrested for stabbing someone on the night of June 10/11, 1989, it occurred to me that Justin might have said 'I got him here,' but I was not sure whether that was what he said.

"5. When I was called to testify before the Grand Jury, I testified as to what I thought Justin might have said on the night in question.

"6. Approximately one month after my testimony before the Grand Jury, I met with [the] Assistant District Attorney . . . . At that time I told [him] that I was not certain of what I had heard Justin say.

"7. When I told this to [the Assistant District Attorney], he became extremely angry, threw something down on the desk, slammed his hand on the desk, pushed back his chair, stood, and said to me in a loud voice that I had already testified before the Grand Jury and that I could not now change my story.

"8. [The Assistant District Attorney] then explained to me the penalties for perjury, and stormed out of the room, giving me no opportunity to reply or explain my prior statements.

"9. When [the Assistant District Attorney] returned, he said that I needed to decide whether to tell the truth or to protect a friend. At that time, I told [him] that I was not trying to protect anyone, but that I was just not sure if I had heard Justin make the statement to which I had testified before the Grand Jury.

"Signed under the pains and penalties of perjury,

/s/ Andrew Calkins."

[15]At the grand jury, Calkins testified that while he was on the couch at Price's house and people were talking about the stabbing, the defendant "leaned over and whispered to me, he said that it was him, he did it." When asked what words the defendant had used, he answered, "I couldn't quote

anger — if true, such behavior was clearly troublesome and improper — the defendant has not shown any prejudice. The Calkins affidavit does not support the defendant's contention that Calkins was intimidated and therefore failed to give favorable testimony to the defendant. The affidavit not only does not claim or suggest that Calkins's trial testimony was inaccurate but it also does not claim that it was in any way affected by the prosecutor's alleged extreme irritation or threats.[16]

Here again we deem it unnecessary to remand for an explicit determination by the trial judge that the Calkins affidavit did not raise a substantial issue requiring a hearing. We conclude there was no error in his denial of the defendant's motion on his claim relating to Calkins's trial testimony.

4. *Manslaughter instruction.* The judge properly denied the motion insofar as it claimed that the judge should have, sua sponte, given a manslaughter instruction. That issue was determined in our previous decision,[17] and in any event, a review of the record indicates the accuracy of the statement in that opinion: "There was no evidence that the defendant was provoked by the victim, faced sudden combat, or possessed the subjective state of mind to require a manslaughter instruction." *Commonwealth* v. *Holmes*, 32 Mass. App. Ct. at 908.

*Order denying motion for a new*
*trial affirmed.*

---

him. He said, I was the one that stabbed him, or whatever, something like that." He also testified, "He said on the side," and touched Calkins on his right-hand side.

[16]As the defendant concedes in his brief, it is not improper for a prosecuting attorney to advise a prospective witness of the penalties for testifying falsely. Cf. *Commonwealth* v. *Penta*, 423 Mass. 546, 549-550 (1996). Of course, if the prosecutor went beyond that, and intimidated the witness, such behavior would have been highly improper. See *Commonwealth* v. *Turner*, 37 Mass. App. Ct. 385 (1994). The timing of the judge's denial, see note 11, *supra*, may have precluded the filing of a counter affidavit by the trial prosecutor.

[17]Contrary to the defendant's contention, his brief on his direct appeal raised the exact issue upon which he now relies.