## COMMONWEALTH vs. JOSE CORREIA.

No. 04-P-1595.

Middlesex. November 15, 2005. - March 1, 2006.

Present: RAPOZA, GELINAS, & COWIN, JJ.

*Homicide. Practice, Criminal,* Request for jury instructions. *Evidence,* Hospital record, Exculpatory.

The judge at a murder trial properly denied the defendant's request for an instruction cautioning the jury to study with care the credibility of the key Commonwealth witness, where the witness made no agreement, explicit or implicit, with the prosecution to provide truthful testimony; where the Commonwealth did not vouch for the witness's credibility; where the issues of motive and bias were fully explored in cross-examination and in argument; and where the judge gave a proper charge on witness credibility. [600-604]

At a criminal trial, there was no palpable prejudice to the defendant resulting from the judge's redaction from the victim's medical record of allegedly exculpatory evidence (a hospital physician's notation regarding where the bullet entered and exited the victim's body), where the redacted evidence had no direct relevance to any live issue in the case and substantially was undercut by other properly admitted evidence. [604-606]

INDICTMENT found and returned in the Superior Court Department on March 22, 2000.

The case was tried before *Elizabeth B. Donovan,* J.

*Jane Larmon White,* Committee for Public Counsel Services, for the defendant.

*Heather E. Hall,* Assistant District Attorney, for the Commonwealth.

GELINAS, J. After a jury trial in the Superior Court, the defendant, Jose Correia, was found guilty of manslaughter in the shooting death of Gary Chatelain.[1] On appeal, Correia argues

---

[1]Although the grand jury had returned an indictment for murder, the Commonwealth nol prossed so much of the indictment as alleged murder in order to comport with another country's laws of extradition. More specifically, the

that the judge (1) improperly denied his request for an instruc-
tion cautioning the jury to study with care the credibility of the
key Commonwealth witness; and (2) improperly redacted
exculpatory evidence from the victim's hospital record. We
affirm.

The Commonwealth did not proceed on a theory of joint
venture, although another with potential animus was present at
the shooting. The critical question at trial was the identity of the
shooter: Correia or Antonio Benders, a friend of Correia who
was present at the shooting and was the key witness against
him.

We summarize the facts that the jury could have found,
reserving detail for our discussion of the issues. At about 5:15
P.M. on Christmas Eve in 1999, a group of three persons began
to verbally harass Correia and Benders in the Cambridgeside
Galleria Mall. Correia told Benders of two previous encounters
with the victim, who was one of the three. As Benders and Cor-
reia walked toward the parking garage, they were followed by
the victim's group. Hostilities escalated in the garage, culminat-
ing in the victim's death from a single gunshot wound to the
back.

The weapon used in the shooting had been taken into the
garage by Correia. Correia's defense was that he had given the
gun to Benders, who then had shot the victim. Benders agreed
that he had been given the weapon, but that in the course of his
struggle with the victim, Correia had retrieved the gun and shot
the victim in the back.

At trial, the judge redacted from the victim's medical records
a hospital physician's notation that the bullet had entered the
victim's chest and exited through his back.

*Jury instruction concerning witness credibility.* Benders was
the prosecution's key witness. He testified that the victim's
group began to run towards them in the parking garage. He
thought that one member of the group was going to pull out a
gun. Correia removed a gun from his waistband and gave it to
Benders. Pointing the weapon at the victim and his group, Bend-

defendant had fled to a country (Portugal) that would not extradite if the
crime charged carried a penalty of death or life imprisonment.

ers began to run towards them. Benders knew the defendant kept the gun loaded, but without a bullet in the chamber. The group dispersed. The victim, however, turned around and charged, knocking Benders to the ground. Benders fell on his back, holding the gun in his right hand, while the victim was on top of him, punching him. Benders tried to keep the gun away from the victim by putting his right arm around the victim's back. Benders testified that someone took the gun out of his hand, allowing him to bring both of his hands in towards his body and chin in an attempt to push the victim off of him.

Benders then heard a single gunshot and immediately felt the victim loosen his grip and "the energy come out of him." Benders pushed the victim and rolled out from underneath him.

Leaving the car behind in the parking garage, the two ran through the mall to the subway station, eventually reaching a relative's house in Mattapan. During their flight, Correia told Benders that he had shot the victim, and that he thought he was dead. Correia also told Benders that he threw the gun in a trash can at the mall. While fleeing, Benders realized that he, too, had been shot near his right elbow, on the outside of his forearm. Benders's uncle removed the bullet from Benders's arm.

Two independent eyewitnesses also testified for the Commonwealth. Each testified to seeing the group and to seeing the gun. Both testified to not seeing the gun change hands, and that only one person, the victim, fell to the ground. Each testified that his view was somewhat obstructed. One of the witnesses identified Correia as the shooter from a photo array, although he selected different people from another array that included Correia's photograph.

Relying on the eyewitness accounts that indicated the weapon never changed hands, and Benders's admission that he had run towards the victim holding the gun, the defense contended that Benders, not the defendant, was responsible for the victim's death.

After the shooting, Benders left Massachusetts. He was located in New Jersey by the police, and voluntarily agreed to accompany them back to Cambridge to discuss the shooting. During the ride, Benders talked about the shooting, but did not

divulge the shooter's name, referring to him only in the third person as "the shooter."

Once in Cambridge, Benders was brought to the detectives' office and interviewed. At one point, Benders stopped the questioning and asked to speak to somebody who could tell him whether his telling the truth was going to result in his being charged with a crime. He stated that he was concerned that he would be prosecuted as an accessory to the homicide, and that he had lied to the police when he had told them that he never had touched the weapon. Within minutes of making his request, assistant district attorney Robert Delahunt entered the interview room.

Delahunt told Benders that "[w]e're only interested in the shooter." Benders understood this response to mean that he would not be charged as long as he did not name himself as the shooter. The conversation between Benders and Delahunt lasted about twenty minutes, after which Benders named Correia as the shooter. Benders was then taken to the hospital for treatment of the wound in his elbow; X-rays taken at this time were consistent with his statement that the wound had been caused by a bullet.

At trial, both the police and Benders repeatedly testified that no promises, rewards, or inducements had been offered, or threats made, to induce Benders's cooperation. No charges were brought against Benders. Correia asked for an instruction counseling the jury about the pitfalls when a witness is promised leniency in return for inculpatory testimony. The judge did not give the instruction.

Correia argues that Benders should be considered much as a witness who testifies for the prosecution in exchange for an agreement for favorable treatment, because the assistant district attorney told Benders that the prosecution was only interested in the shooter, and no charges were brought against Benders. Correia maintains that the conversation, and the lack of prosecution, is tantamount to a promise of immunity in return for Benders's testimony. Therefore, Correia contends, the judge erred when she denied the defendant's request for the instruction discussed in *Commonwealth* v. *Ciampa*, 406 Mass. 257, 263-264, 266 (1989).

We think *Ciampa* inapplicable to the case at bar. Unlike in *Ciampa*, there was no agreement here, explicit or implicit. See *Commonwealth* v. *Dixon*, 425 Mass. 223, 233 (1997) (no vouching occurred when witness did not have agreement with government). The mere fact that Benders may have expected and, in fact, received favorable treatment by not being charged did not amount to a deal. See *Commonwealth* v. *Doherty*, 394 Mass. 341, 348 n.9 (1985).

Also unpersuasive is Correia's contention that this case should be governed by *Commonwealth* v. *Davis*, 52 Mass. App. Ct. 75, 78-79 & n.7 (2001). Correia argues that Benders had entered into an "amorphous arrangement[]" with the Commonwealth that required the "same prophylactic measures mandated in [*Ciampa*]." See *id.* at 78 n.7. We do not agree. In *Davis*, the witness testified that, after he was charged with distribution of marijuana, he agreed to help police arrest others involved in the illegal sale of drugs in exchange for nonspecific "consideration" from the prosecution. *Id.* at 76. In this role, he bought cocaine from the defendant, and the witness's testimony was the lynchpin of the prosecutor's case. *Ibid.* We held that "the same prophylactic measures mandated in [*Ciampa*] with respect to written agreements apply to more amorphous arrangements like the one here, where there was no binding pretrial agreement." *Id.* at 78 n.7. Here, Benders was never charged, and there was no testimony that he agreed to testify in exchange for consideration. Benders made no promise to provide truthful testimony for the prosecution, and the prosecution, for its part, did not promise Benders that he would not be prosecuted, or offer "consideration" in return for his testimony. The prosecutor simply indicated that his office only intended to prosecute the shooter, and at the moment the prosecutor made that statement, it was not entirely clear who the shooter was.

Furthermore, even if we were to assume that the exchange between Benders and Delahunt could be viewed as some form of agreement cognizable either under *Ciampa* or *Davis*, its terms did not create the danger that *Ciampa* and *Davis* sought to address. The court in *Ciampa* "found unfair prejudice in the manner of presentation to a jury of a written plea agreement in which the Commonwealth promised a particular sentencing

recommendation in exchange for truthful testimony." *Commonwealth* v. *Grenier*, 415 Mass. 680, 687 (1993), citing *Commonwealth* v. *Ciampa*, 406 Mass. at 262-263. Particularly troubling in *Ciampa* were the repeated and unnecessary references to the witness's obligation to tell the truth. *Commonwealth* v. *Daye*, 411 Mass. 719, 739-740 (1992), citing *Commonwealth* v. *Ciampa*, 406 Mass. at 262-263. These references permitted the inference that the Commonwealth knew or could have discovered whether the witness was telling the truth, or put differently, the references suggested that the Commonwealth was vouching for the truthfulness of its own witness. See *Commonwealth* v. *Ciampa*, 406 Mass. at 260-263; *Commonwealth* v. *Daye*, 411 Mass. at 740; *Commonwealth* v. *Grenier*, 415 Mass. at 687.

The *Ciampa* court held that the judge's instructions were insufficient to cure possible prejudice caused by the manner in which the prosecution used the particular plea agreement it had reached with a key witness. *Commonwealth* v. *Ciampa*, 406 Mass. at 263-264, 266. See *Commonwealth* v. *Prater*, 431 Mass. 86, 98 (2000) (in *Ciampa*, prejudicial admission of certain portions of written plea agreement was not cured by judge's charge). The *Ciampa* court held that in those instances when a prosecution witness testifies pursuant to a plea agreement that is contingent upon the witness testifying truthfully, the judge should advise the jury to "study the witness's credibility with particular care," *Commonwealth* v. *Ciampa*, 406 Mass. at 266, and warn the jury that the government does not know whether the witness is telling the truth, *Commonwealth* v. *Meuse*, 423 Mass. 831, 832 (1996). The wording of a particular agreement with a key witness is crucial to the conclusion that it is contingent upon the witness's truthfulness, thus invoking the prohibited inference that concerned the *Ciampa* court. See *Commonwealth* v. *Holmes*, 46 Mass. App. Ct. 550, 553-556 (1999). When the language of an agreement makes clear that it is the witness who is making the representation that he will testify truthfully, rather than the government guaranteeing it, the agreement is admissible without any cautionary instruction, provided the prosecutor does not use it improperly in closing argument. *Ibid.*

In *Davis*, the principal concern addressed was the witness's motive to lie, in addition to the governmental endorsement of a witness's veracity. *Commonwealth* v. *Davis*, 52 Mass. App. Ct. at 77-79. We recognized that an agreement that promised "consideration" with respect to pending charges provided the twin difficulties of permitting the Commonwealth to argue that no specific promises had been made, and of providing the witness with stronger motivation to lie. *Id.* at 78 n.7. Indeed, the issue in *Davis* was triggered in part by a jury question concerning the effect of the open-ended agreement on the witness's motive to lie. *Id.* at 76-77. We noted, however, that the absence of an instruction on this point, although improper, did not in itself provide grounds for reversible error, absent express vouching by the Commonwealth. *Id.* at 78-79.

In the case at bar, the exchange between Delahunt and Benders contained no explicit reference by either party to Benders's obligation to provide truthful testimony. Even if the requirement of truthfulness could be implied, the evidence does not present the realistic possibility, unlike in *Ciampa*, that the jury would believe Benders's testimony based on an implicit agreement to tell the truth, rather than on the jury's independent assessment of his credibility. See *Commonwealth* v. *Daye*, 411 Mass. at 740. The prosecutor avoided suggesting that Benders's testimony was truthful because Delahunt or the police could discern when he was telling the truth, as well as suggesting that, with the leverage the Commonwealth had to bring future charges, Benders necessarily told the truth. Contrast *Commonwealth* v. *Meuse*, 423 Mass. at 832. Rather, the prosecutor argued that Benders's testimony ought to be believed because the physical evidence, most notably the bullet removed from his elbow, as well as the nature of the victim's wound, supported his version of events. This argument was entirely proper.

Additionally, defense counsel vigorously cross-examined Benders, highlighting the likelihood that he may have named Correia as the shooter to avoid criminal liability, and counsel's summation stressed Benders's lack of credibility for this reason. See *Commonwealth* v. *Daye*, 411 Mass. at 740; *Commonwealth* v. *Holmes*, 46 Mass. App. Ct. at 556. The judge fully charged the jury that, in considering whether witnesses were credible,

they should consider motive, bias, and interest in the outcome of the case. With no agreement and no Commonwealth vouching, with the issues of motive and bias fully explored on cross-examination and in argument, and with a proper charge on witness credibility, there was no error in failing to give the requested instruction.

*Hospital record.* The defendant argues that the judge, over objection, improperly redacted from the victim's hospital record a hospital physician's notations that the bullet had entered the victim's chest and exited through his back. Correia argues that these statements were "exculpatory of the defendant" because they "called into question the credibility of the chief prosecution witness, Antonio Benders." Correia contends that he was deprived of impeachment evidence. In his argument, he urges us to conclude that the error is of constitutional dimension. Even assuming, without deciding, that the hospital record was admissible as being relevant to history, diagnosis, or treatment and thus entitled to admission under the statutory hearsay exception, there was no error.

Generally, the mere failure to impeach a witness does not prejudice the defendant or constitute ineffective assistance. *Commonwealth* v. *Ortiz*, 53 Mass. App. Ct. 168, 180 (2001), citing *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001) (in the final analysis, "[i]mpeachment of a witness is, by its very nature, fraught with a host of strategic considerations").

Correia is entitled to review of any alleged error under the prejudicial error standard. See *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). An error is nonprejudicial only "[i]f . . . the conviction is sure that the error did not influence the jury, or had but very slight effect . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Ibid.*

The forensic and medical evidence showed that a bullet had entered the victim's back, traveled from right to left in a slightly upward direction, and exited the victim's body through his chest. No bullet was recovered from the scene or from the victim's body. The evidence also suggested that when the bullet

exited the victim's chest, his chest was not in contact with a hard surface, such as a cement floor. Tests conducted at the State police crime laboratory showed that copper and gunpowder residue were found around the hole made by the bullet in the back of the T-shirt the victim was wearing. Testimony showed that these residues were consistent with a bullet entrance, because a copper bullet would leave copper residue as it passed through the clothing and gunpowder residue comes out of the muzzle of a weapon when it is discharged. Neither copper nor gunpowder residue was found around the hole in the front of the victim's T-shirt. In addition, the medical examiner testified that the characteristics of the wound on the victim's back were consistent with an entrance wound, and the characteristics of the wound on the victim's chest were consistent with an exit wound.

Even if we were to assume that the notations by the hospital physician should not have been redacted, the error did not harm the defendant. At trial, both eyewitnesses testified that the fatal shot was fired from a gun that was held by a man who was standing over the fallen victim.

The most difficult piece of physical evidence for Correia to overcome, in convincing the jury that Benders was the shooter, was testimony that a bullet was removed from Benders's elbow, and that an X-ray of Benders's arm injury was consistent with a high velocity bullet having been lodged in Benders's bone. The prosecutor recognized the significance of this evidence, and made it the centerpiece of her argument that Benders should be believed. For his part, Correia relied on testimony that someone in the victim's group had a gun, and argued that Benders's wound could have been inflicted when the two groups were shooting at each other.

The redacted statements in the hospital record merely suggest that the victim was on his back when he was shot, or in a position that would permit the bullet to enter from his chest. That evidence does not negate Benders's assertion that he was underneath the victim. To the extent that it contradicts Benders's testimony that he and the victim were on the ground, "stomach to stomach," Benders's precise position underneath the victim at the moment of the shooting had little, if any,

relevancy to a determination of who discharged the gun from a standing position. Any suggestion contained in the redacted hospital record to the effect that the victim was shot in the chest is negated by the plethora of forensic evidence discussed *supra.*

In sum, there was no palpable prejudice in the exclusion of the doctor's notations when, as here, the evidence had no direct relevancy to any live issue in the case and substantially was undercut by other properly admitted evidence.

*Judgment affirmed.*